Good morning, your honor. May it please the court, Mary Gibbons. I'm appearing for appellant Yu Sung Park and I will be addressing only the issue concerning the the error in applying rule NOE-D2E, the co-conspirator statement rule with regard to the application and admission of the statements of defendant Tran and the informant against my client, Mr. Park. Just as a basic introduction, the evidence in this case consisted largely of conversations between January and July between Mr. Tran and Mr. Dow, who was the government co-operating witness. Excuse me, Ms. Gibbons, you're going in and out. Do you have the microphone squarely in front of you? I do. There you go. All right. Is that better? Is that better? It's a little better. Our technical people. Okay. Keep going. We can hear you. Try just talking to the mic. Okay. Mr. Park himself does not make an appearance in this case, which started out in January. He doesn't appear at all until there's a reference to him in June and in early July he accepts a controlled delivery of money that is sent to Louisiana. He then arrives in California in July and is arrested the next day with Mr. Tran. But for the entire period of time of the conversations between Mr. Tran and the informant, there is reference by Mr. Tran to his boys, his dialed in guys, people that he has committed robberies with before. There's a lot of discussion, but never as to Mr. Park and Mr. Park is never identified and Mr. Park makes no appearance whatsoever. So until he arrives in July, there's nothing really to connect him or there's no separate evidence to show that he has any involvement whatsoever in this conspiracy. There is no conspiracy at this point because we only have Mr. Tran and the informant. How is it that he just happened to show up in California in anticipation of the robbery? Is it just coincidence? He arrives in California at some point. He has accepted money in early July and then he comes to California. But for the statements that are admitted during the six month period prior to this are terribly prejudicial to him. Does he arrive? Yes, he does. But prior to this time, the jury has heard all of these statements saying that he's done these robberies before, that he's battle tested. And in fact, Mr. Park has no criminal record whatsoever. He has no criminal history and no history of violence, nothing whatsoever. This type of inadmissible, even if it were true and the fact that it was not true, made it enormously prejudicial to him. Counsel? Yes. Do you agree that we are reviewing this issue for plain error? Yes, Your Honor. Unfortunately, I do agree with you on that. Does that make, does that change your argument at all? Uh, this argument was not made in the district court, Your Honor. I was not the trial counsel and the argument was not made. So why is this plain error then? I think you're arguing more as if this were a de novo determination. How was this plain error? It's plain error because the district court was aware that there was no conspiracy when you just have an informant and a was aware that there couldn't be a conspiracy until Mr. Park arrives in some fashion in the case. The district court discusses this in connection with the jury instructions and yet has admitted all of this evidence of Mr. Tran. And this was days and days of recorded conversations that were very prejudicial to Mr. Park. Plain error? The district court should have realized this is a fundamental principle under Rule 801 of co-conspirator statements and it should have been brought up that there needed to be the preliminary determination before these were admitted. May it please the court, my co-counsel and I had an agreement with regard to time. So if it's acceptable to the court, I'd like to focus for a few moments then on claims one and two. I cannot look at this case as counsel without drawing into focus the fact that not only does my client not have a criminal history and not only was he previously a special agent at the FBI, he was an agent at the FBI who received the incredible distinction of having been selected to serve the United States Senate when the United States Senate under Chairman Leahy convened an investigation into the FBI. And as the district court was well aware during the pre-trial proceedings, it was after my client returned from that special detail to his normal post at the FBI and declined to answer questions regarding what the Senate was investigating in the Bureau that his career began to go dramatically downward. And the events that of which is that years later he was doing what is at issue in this case, which unquestionably is tragic, unquestionably was a very poor judgment, but I submit to the court isn't necessarily and might not have been determined by the jury to have been criminally motivated if the trial, in fact, had been correct and proper and fair. We have inchoate crimes here. We have a missing informant who we now understand from the records that are before this court pursuant to its order granting judicial notice, in fact, has gross allegations of discontent and disharmony, disagreement with the government. None of that was put in front of the jury. But Counsel, wasn't the defense given the opportunity to question the informant at trial? No, Your Honor, the defense was not given the opportunity to cross-examine. I'm sorry. I said to question. Yes, Your Honor, the defense was given the opportunity to call him as a defense witness. But as we point out in our briefing, it's our position that that was not an appropriate or adequate remedy. And therefore, that actually doesn't address the concerns that we've put in front of the court. Why was the informant's testimony essential to establishing the admissibility of the tape-recorded conversation? It's a violation of the Fourth Amendment otherwise. If there's not the predicate laid to show that these were actually consensually recorded, consensually intercepted and recorded conversations, there's a violation of privacy. I thought the FBI agent testified that, you know, there was a, what was it, a consent form signed? You're correct, Your Honor. And he testified about how he provided all the recording equipment? He did. And met with the cooperating witness afterwards? Your Honor. Why isn't that all enough for the jury to infer that there was consent? My goodness. Because those statements themselves were hearsay. So we have effectively bootstrapped hearsay upon hearsay. All of what the FBI agent testified to in this event was inadmissible in its own right. Was the FBI agent cross-examined at the trial? He was cross-examined on these matters. But he couldn't, the cross-examined couldn't reach to the true crux of the matter, which was what the informant did or didn't agree to do. And as we know, now there's a dispute about what the informant did or didn't agree to do. But all of those questions could have been posed to the informant if he were called as a defense witness. Not as cross-examination, Your Honor. But they could, whether it's cross-examination or direct examination, the information could have been garnered from the informant. Does it matter the form of the questioning if the purpose is to get the information before the jury? Most respectfully, yes, it does, Your Honor. Now what case says that the defense is entitled to cross-examination as opposed to direct examination to get information in? Do you have a specific case that says that? My most immediate response would be United States v. Crawford. United States Supreme Court very clearly rejected the approach that I understand Your Honor's grappling with. And in that instance, Mr. Crawford's wife was the critical declarant. And she was clearly available to the defendant. And she could have been called by the defendant in his defense had he chosen to do so. But the difference here is the declarant was the FBI agent. And you were able to cross-examine the FBI agent. I'm sorry, Your Honor. I have to disagree. And I'm sorry. But the declarant was actually But you're arguing the declarant's the CI. The CI. Yes, that's correct, Your Honor. The declarant, the true party here was Mr. Dow. And the FBI agent, I'm sorry, but in my judgment, simply doesn't become relevant. I understand why the court might look to him as a potential answer. And if I may respectfully point out to the court, we're also talking about a defendant who had a different matter in federal court in Georgia, where the presiding federal judge found those FBI agents were dishonest. You're arguing they have a motivation to be dishonest, and you were sandbagged at trial. Because there was the inference. Were you at the trial? No, Your Honor. I was not trial counsel. I appeared for sentencing, but I did not handle that at trial. Had I tried the case, then I might be in the position to argue that. But I think our record limits me a bit here. But the Georgia district court proceedings were before the trial judge, including the findings that the FBI agents were dishonest in their testimony as against Mr. Tran. So that's the reason, I think, that buttresses the concern we have that the district court turned to yet again an FBI agent when Mr. Dow is who should have been called. Here's my concern about your argument. It would appear to me then every time there is recorded conversation that's played in a trial, you would have us say that the people who are on the tapes have to actually testify. Are there cases that say that? The cases say it by implication, Your Honor. Lopez and White, both Supreme Court cases cited in our opening brief, do speak to the fact that you need consent, that there are Fourth Amendment issues afoot. But in those cases, what they are dealing with is the normal scenario, which is what courts deal with most of the time, where the consenting party is actually before the court or there's no dispute. And by agreement between the parties, that party, that person doesn't have to be brought in. I mean, the fact that the agent testified that the cooperating witness signed the consent form, I don't know what more the government needed to do. There was much that was afoot here, Your Honor. That may be the case, but the fact of the matter remains is that there was a consent form that was signed. We don't even know, however, what the full scope it is of what Mr. Dow did with Mr. Tran. What did come out during trial, after that signature was obtained, Your Honor, shows that the FBI, the government, had obtained a cloned SIM card. Whether or not Mr. Dow was even aware of the extent to which his activities were under surveillance is a question that's open on this record. It's not a question that we should have to grapple with, but we do. It's there. So I understand the temptation the court might have to turn to that signature card, but I have to respectfully suggest that it is in violation of the same case law that the original problem created. Is this also under a plain error review, however? No, Your Honor. I respectfully submit this is de novo review. These are the Fourth Amendment issue was fully preserved. The interpretations of the rules of evidence are de novo review questions as well. And if I may, with all respect, I'll reserve my remaining time for rebuttal. Thank you. Your Honor, good morning. Rob Keenan for the United States. Were you the trial counsel? I was, yes, Your Honor. I wanted to start just briefly addressing the suggestions made by Mr. Trevino about some suggestion that the government's investigation of Mr. Tran and the prosecution of him was in some sense vindictive because he filed a prior lawsuit against the FBI. I don't think that was the extent. It was because he previously investigated the FBI for misconduct. And those additional facts. So basically, the FBI was on a vendetta. That was being summary. I'm sorry. But the main point I wanted to make on that is pretrial. We filed a pretrial motion under Rule 12b-3 saying that's not evidence that's properly submitted to the jury during the trial. If you want to file a motion like that, you can do so, but it's not a trial issue. That was specifically in the court's docket sheet number 61. What happened with that? The motion was granted, excluding evidence of that. And in our motion, in our reply brief, we said, you know, you can do it pretrial. Just have to do it pretrial. And the defendants, notwithstanding that notice, made no effort to raise those issues in a pretrial hearing. So these arguments that they make in the reply brief and here today, trying to suggest there's some taint on the investigation or the case. Really, there's no record. And there's a reason there's no record of that. Because they didn't pursue it. May I ask why the government was so evasive about calling the informant? About committing to whether it was going to call the informant? Well, you know, there's a representation in the, or an argument made in the reply brief here that the government made a representation well before trial. And that's why the defendants didn't file a motion to suppress. They made no such representation. I did see in the motion and in the reply brief, the opening line in the statement of facts that the government, before trial, made a promise or representation it would call the CI. But the only representation I made was on the, it was before trial, in the sense before the opening statements and before the evidence. But it was during, it was right near the end of the voir dire process, we cite to it in our brief, where I was told as a courtesy that the government was required to disclose essentially which witnesses would be on deck. That's when I did it. Prior to, in other cases, I don't disclose it. And I'm typically not ordered to disclose the order of my witnesses. In this case, I did tell the defense counsel, at the time indicated in our reply brief, on the, near the end of the voir dire, that the CI was going to be either a second or third witness, depending on the Louisiana agent's travel schedule. But the, and that was truthful when made. And there's, the record is example, a truthful statement of my intent. And the record is replete with examples documenting that. Number one, we submitted, unusually, in our motion, opposition of the motion for a new trial, a copy, redacted copy of our internal, you know, government witness list. The one that my co-counsel and I used to essentially map out our order of proof. Who, you know, who would, you know, what witnesses each counsel would take, et cetera. Number three, on our list. It's not unusual to present a witness list pre-trial. That's not unusual. Well, actually, that was just our internal witness list. In other words, our publicly filed witness list had a number of people on there that were potential witnesses. They had knowledge of relevant facts, but we didn't wind up calling either. Including the informant, right? Including the informant. He was not named using his name, but he was identified as a confidential informant. So there were a number of people we didn't call. But so on our, he was on our internal witness list, is the main point I wanted to make there. That's GER page 893. He was number three on our list. But when the concern was raised, and you understood what the concern was from the defense, and the court specifically asked, are you or are you not going to call this person as a witness? That's, there seemed to be a little bit of fudging there in terms of whether you were or weren't going to call him as a witness. Yes. And intentionally so. I didn't want to commit one way or another. Because A, I didn't have to. And B, you know, trials are fluid things. You don't know exactly what points are going to be raised during, for example, cross-examination of other witnesses. Doesn't the government have a high, I mean, the U.S. Attorney's Office have a higher obligation than that, than playing trial games? Well, actually, no trial games were being played. Well, I think the transcripts were pretty evasive about whether or not noncommittal and probably for strategic reasons or tactical reasons. Actually, I beg to differ. And let me get back to the record on that. What exactly did you say? What exactly was the statement that you made? On the, near the end of the voir dire, when we were told to, that as a courtesy, it was the policy of the district court to disclose. I don't want to hear the context. I want to hear what you said. The two or three defense lawyers sonnered up to the lecterns and said, who do we expect? What's your first couple of witnesses? And I told them, the case agent, a Louisiana federal agent, forget his name, and the CI. That's what I said. I told them that it would either be, the CI would either be second or third. Because I wasn't, there was some question about the Louisiana agent's travel schedule. That's it. There was no representation made before trial, by the way, to get to the point. So the defendants didn't fail to file a motion to suppress before trial because of some promise made well before trial that we would call the CI as a witness. But when the court asked the government to verify whether or not the government would be calling the informant to testify, you said the decision to call him as a witness would be made during the course of the trial. Correct. So do you think that was a direct answer to the court's question? Yes. Is it your representation that at that point in time, the government had not decided whether or not to call the informant as a witness? We made no decision whatsoever that we would not be calling the CI. Would or would not? Would not be calling. Either way. Well, he was on our witness list. I was inclined to call him, but he was not an essential witness. Frankly, he became a witness. My question to you was, at that point when you responded to the court, had you made a decision one way or the other whether the informant would be called as a witness? I made no decision one way or the other. When did you make the decision not to call him? You know, nearly at the end of the government's case in chief as we evaluated it. You know, frankly, the defense theme that it was actually a reverse sting being conducted by Mr. Tran was disclosed to the government during the opening statement on the second day of the trial. I'm sorry. I didn't quite understand your answer. So when was the decision made not to call Mr. Dow? It was during the latter portion. I don't have an exact specific date or time, but it was during the latter portion of the government's case in chief. That's when it was made. And what were the circumstances that led you to that assessment, not to call? Well, there were a number of reasons. First, the government's Mr. Tran's opening statement made clear he wanted to make the case about the CI rather than about the defendant's conduct. There were references to him that the CI had engaged in lots of criminal behavior. And there are inherent risks in calling the CI. We always prepare to do so. We call them if it's essential. And, you know, or if we think it's going to be important to present a coherent case to the jury. So that was number one. On the first opening statements, they frankly made suggestions that they might have additional evidence that we didn't know about, about misconduct of the CI. It makes us somewhat risk-averse to call him unnecessarily. In addition, the defense theme was presented, which was this reverse sting notion. And at that point, the commentary that I had in mind regarding, you know, asking questions of the CI about, you know, what was meant during certain conversations, telephone calls, meetings with Mr. Tran, what he understood Mr. Tran to be saying, those kinds of typical questions, those largely became less important as the case proceeded. Because the real focus was, as to those tapes, during my direct examination of the case agent, started to focus on showing why that couldn't be true, why that defense theme didn't make sense. And so the importance of the CI's testimony to describe how the investigation proceeded seemed less important. And lastly, the, you know, I would note, there were a number of other witnesses. I forget the name. Mr. Danny, Danny Boyle, I think was his name. You know, who I contemplated calling. This is an associate of Mr. Tran, who I contemplated, Boyer is his name. I contemplated calling during our case in chief. I decided not to at the end of the day. During our rebuttal case, I decided I'm going to call him. And there's, in the record, and I attempted to do so. The judge said it was too late. But it just highlights that these decisions as to who to call as a witness are, need to be fluid. And the... Right. And none of us has any experience with doing a trial. So we... No, I'm... Counsel, excuse me, I have a question for you. Did the district court give Valerio instruction that, instructs the jury that Dow's statements were to be used not for their truth, but for their context only? No, he did not. Was that error? It was not error. Number one, it was not requested. Number two, Valerio doesn't say it's a requirement. They cited to it as, you know, one fact that suggested there was no prejudice. But the other cases we cite, in addition to Valerio, don't... The out-of-circuit cases, York, Nettle, Spencer, Barraza, Burden, don't suggest that that's a requirement. And what was the evidence that Park was involved in the conspiracy? Park, by name, was involved in the conspiracy prior to his arriving in California? Well, there's ample evidence. At a minimum, on May 13, Mr. Tran identified his, quote, dialed-in guys as clean-cut... Well, what was the evidence that the dialed-in guy was Park? Well, it developed over time, but on May 13... What was the evidence? Well, okay. List the evidence. Okay. Number one, he's... In May 13, Mr. Tran describes his dialed-in guys. He says they are Korean guys that follow orders. They look clean-cut, no tattoos, et cetera. Mr. Park fits the bill. On May 31, Mr. Tran said his guy, Park, we think, would need money to, quote, get over there. His guy? Did he name Park? No, he didn't ever name Mr. Park. So you just said his guy, Park. His guy, and I explained that I'm referring to Mr. Park, would need money to, quote, get over there to California and buy armored vests. June 10, the first money order for that purpose, the travel costs and the body armor, went to a Mr. HP. That's the only... That's Yoo Sung Park, or Huey, as he's known, HP. The text messages between Mr. Park and Mr. Tran from June 17 on, there are discussions  When are the suits going to arrive? The evidence shows that that's a reference to Mr. Park purchasing the body armor vests or the suits. There were text messages throughout June about scheduling the trip here to California. Mr. Park says that he can't find a tuk. I think that's a typo referring to tool, a typical word that Mr. Park and Mr. Tran used for their firearms. Mr. Park asking about where's the hotel that he's going to stay in. Mr. Park telling Mr. Tran, again, I think it's in late June, that he's telling Mr. Tran to grab a bag. A number of the firearms evidence was found in nylon bags. The June 14 meeting, of course, and the travel out here, all establishes the conspiracy and it goes backward in time, it seems to me, to prove that the earlier statements that Mr. Tran made about his guy were references to Mr. Park. Mr. Tran was out here essentially trying to scare up business so that he could try to find criminal opportunities, namely to commit home invasion robberies. The Fourth Amendment claim, and ultimately what the defendants are trying to do is ask the court to create some new rule, evidentiary rule of constitutional magnitude, because they didn't file a pretrial motion. That's essentially what they're asking to do, a pretrial motion to suppress. There is no credible claim that they relied on any representation by me in not filing such a motion. I made no such representation whatsoever until near the end of the voir dire process, as I've just indicated. And we can take a look, actually, at their reply brief that they filed in support of the motion to strike and motion to destroy. Time is up. Oh, thank you very much. Thank you. Okay. If I may focus on two points that I, the first, I'm very mindful and aware of the contours of the district court's protective order regarding what was not to be mentioned in front of the jury. And it's my suggestion to this court that in no respect has that order ever been violated by trial counselor before this court. Rather, what we're addressing are issues that went to the district court's evaluation of proffered evidence and the propriety of receipt and evidence of that material. The second point the government counsel raises, which frankly is perhaps the most important thing of all we've heard today, the record before the district court is unambiguous. Trial counselor Yolanda Barrera put a declaration under oath before the district court judge as soon as this issue came to light, in which she recited under penalty of perjury that in fact, the government had told the defense counsel that it would call down at no time, at any point in the district court proceedings or in any of the briefing before this court, the government ever challenged that statement or offer any sworn testimony to the contrary. Counsel now stands before this court at a point when I have no ability to do anything other than recite the record. The record is clear. If he had been, in fact, I'd have to ask this court to consider why that representation was not made to the district court that he challenged what counsel Barrera was saying at a point when it could have been developed if, in fact, there was a misstatement. But the court acted on the presumption that there had been a representation that the witness would be called and sorted it all out and made a ruling on it. I believe that the court did and I think that that is correct because the status of the record shows that that was the evidence in front of the district court. I'd be happy to brief this if the court thought further briefing would be helpful from the parties to establish whether there's any point anywhere in the record, either before the district court or this court until just this time this morning, if the government ever challenged that statement, that characterization of what it told those defense counsel. Ms. Barrera put her declaration before the district court. Counsel Kessel joined in that recital and the district court proceeded on that understanding is my interpretation of this record. With that, I'm happy to answer any further questions the court may have, but I do notice I've exceeded my time. All right. Thank you very much. U.S. versus Park et al will be submitted. Thank you, counsel. And we will take up United States versus Cardenas.
judges: Wardlaw, Paez, Rawlinson